FILED'08 JUN 03 12:27USDC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

UNITED STATES OF AMERICA,

Plaintiff,

v.

OCTAVIO MENDOZA-MORALES,
HERIBERTO MONTENEGRO-MENDEZ,
and HECTOR RICARDO VILLARUEL-
LOPEZ,

DefendantS.

CR 05-98-2-KI
CR 05-98-3-KI
CR 05-98-4-KI

OPINION AND ORDER

KING, Judge:

Before the court is defendant Heriberto Montenegro-Mendez's Motion *In Limine* to

Suppress Testimony by Reason of Bad Faith Destruction of Monitoring Notes (doc. 721).

Defendants Octavio Mendoza-Morales and Hector Ricardo Villaruel-Lopez joined the motion.

PAGE 1 - OPINION AND ORDER

On May 19, 2008, the court heard oral argument. For the reasons set forth below, the motion is DENIED.

## **Factual Background**

On February 18, 2005, Judge Haggerty issued an order authorizing the Drug Enforcement Administration ("DEA") to intercept incoming and outgoing calls on defendant Ricardo Mendoza-Morales' ("Ricardo") cellular telephone. Because Ricardo speaks Spanish, DEA hired three Spanish-speaking civilians as independent contractors to monitor the phone conversations: Jose Hermosillo, J.C. Mora, and Alex Nunaheid (who the government does not intend to call as a witness). Hermosillo has worked as a civilian monitor on approximately 26 wiretaps over the past five years. (Hermosillo, at 17).[1] Mora has worked on approximately 90 to 100 wiretaps over the past 10 years. (Mora, at 78).

As wiretap monitors, Hermosillo and Mora listened to Ricardo's phone calls in a secure "wire room," prepared summaries of the calls (known as Line Sheets), and translated the calls into English. The Line Sheets, which were the monitors' final work product, contain the time and date of the call, the monitor who was listening to the call, whether the call was incoming or outgoing, the phone number and subscriber information for the other phone (to which Ricardo was speaking), and where possible, the identity of the person speaking to Ricardo. Though the monitors have not met or personally talked to the defendants, they were able to identify their voices on the intercepted calls based on various factors, including self-identification of the caller, use of nicknames, distinctive accents, laughter, voice pitch, intonation, and/or repeated use of

---

[1]References to testimony are to the witness and page number of the transcript to the January 3, 2008 hearing.

PAGE 2 - OPINION AND ORDER

particular slang phrases. Any voice identifications made by the monitors in the Line Sheets, however, "were preliminary identifications based largely on information the monitors received from agents" (*e.g.*, corroboration by DEA surveillance and cellular phone subscriber information). Mem. in Opp. at 3-4.[2]

Over the course of the investigation, DEA recorded approximately 700 phone calls from Ricardo's cellular phone. The monitors prepared Line Sheets for each of those calls. In so doing, the monitors often had to listen to a particular call several times. During this process, the monitors sometimes made personal, fragmentary notes "in various forms" to assist themselves in drafting the Line Sheets and identifying voices on the recorded conversations. (Hermosillo, at 64-65). The monitors sometimes shared the notes with each other for "reference" purposes, or to remind another monitor to check a voice identification. (Hermosillo, at 64-65). The notes were not part of any "formal process," but the monitors' "internal way of communicating." (Hermosillo, at 65). According to standard procedure, the monitors destroyed the notes at the end of each shift:

---

[2] The government has provided defense counsel with all of the Line Sheets. The government has indicated, however, that it does not intend to introduce the Line Sheets as evidence at trial. Instead, the government intends to offer the government's Spanish-to-English transcripts of the intercepted calls.

On January 4, 2008, United States District Court Judge James A. Redden found that the government made the "minimal showing necessary to authenticate the voice identifications," and pre-admitted the wiretap transcripts pursuant to Federal Rules of Evidence 104(a) and 901(a). That ruling was predicated, in part, on the government's Offer of Proof, which outlined the evidence the government intends to introduce at trial to prove that the defendants were, in fact, the speakers on the intercepted calls. See January 4, 2008 Opinion and Order (doc. 620); see also Government's Offer of Proof (doc. 605), Exs. HMM-1, HMM-2, HMM-3, OMM-1, OMM-2, OMM-3, and HVL (outlining independent evidence of voice identifications). Judge Redden also ruled that the court "will instruct the jury that they should not infer that the statements on the wiretap transcript were in fact made by a particular defendant merely because that defendant's name is printed on the transcript." January 4, 2008 Opinion and Order, at 3.

HERMOSILLO: They're just my own personal notes, either during the case—I make myself a note to refer back to a certain call or maybe a key word or just notes on I need to finish this report and that's what I meant. I just testified they were personal notes for my own purpose.

ASSISTANT UNITED STATES ATTORNEY ("AUSA"): Okay. But you destroy them in every wire case that you work on?

HERMOSILLO: Yes.

AUSA: All right. And you—in this particular case do you recall whether or not you were instructed by anyone to destroy them?

HERMOSILLO: I was not instructed by anyone.

AUSA: You do this routinely in every case you work on?

HERMOSILLO: Yes, I do.

AUSA: Okay. And you've done this over the course of the five years that you've been a monitor then?

HERMOSILLO: Yes, I have.

(Hermosillo, at 63-64). Hermosillo testified, "I was told to shred the notes as part of my training way at the beginning. I was not told specifically by this agency to shred my notes for this case." Id. at 67-68.

Monitor J.C. Mora also testified that he routinely shredded his notes in every case throughout his 10-year career as a wiretap monitor. (Mora, at 88-89). Mora explained that he kept notes, in part, because there were times when he would be listening to a "live call" and he would not have enough time to prepare a formal line sheet. Instead, he would take note of location references, or time references, and relay that information to the officers on surveillance. Id. at 90. Mora also explained that he sometimes left those notes for the other monitors "[s]o they're aware of whatever is happening or going on at the time, so, . . . [t]hey're not left up in the

PAGE 4 - OPINION AND ORDER

air." Id. at 89.  Mora testified that any information contained in his notes was incorporated into

the Line Sheets.  Id. at 90.

On cross-examination, however, Hermosillo acknowledged that not all of the information

in his personal notes was incorporated into the Line Sheets:

> DEFENSE COUNSEL: Okay. And when you take those notes you do it because you believe that the things that you're writing down in those notes are important for you as part of the way that you're doing your job?
>
> HERMOSILLO: Correct.
>
> DEFENSE COUNSEL: And I assume that they are meant to help you in some way in the way that you're listening to the calls and making determinations as to whether or not the voice on one particular call equals the voice on another particular call?
>
> HERMOSILLO: Part of it is, yes.
>
> DEFENSE COUNSEL: So there's information within those notes that is relevant to the job you're doing but it's not contained in a line sheet, correct?
>
> HERMOSILLO: Usually, yes.
>
> DEFENSE COUNSEL: And there's information within those notes that's not contained within the transcript?
>
> HERMOSILLO: Correct.
>
> DEFENSE COUNSEL: And there's information in those notes that you use in order to make voice comparisons between—or to trigger in your memory voice comparisons between specific calls, because you can't remember every voice?
>
> HERMOSILLO: Correct.
>
> . . . .
>
> DEFENSE COUNSEL: So when you shred those notes you shred relevant information that would help you in determining voice comparisons?
>
> HERMOSILLO: Yes.

PAGE 5 -  OPINION AND ORDER

(Hermosillo, at 69-70).

In preparation for trial, in fall 2007, the government asked the monitors to analyze several recorded jail calls made by defendants Heriberto Montenegro-Mendez and Hector Villaruel-Lopez after they were arrested.[3] The monitors compared the recorded jail calls with various recorded wiretap calls made from defendants' respective phones during the course of the investigation. The monitors then prepared reports stating that it was their opinion that the voices on the recorded wiretap calls matched the voices from Montenegro-Mendez's and Villaruel-Lopez's known jail calls. The government has indicated that "[t]his opinion testimony regarding the comparison of the wiretap calls to the jail calls will be the core of the monitors' testimony at trial." Mem. in Resp., at 4.

Defendants now move to suppress the wiretap monitors' testimony, the monitors' voice identifications, and the telephone intercepts. Defendants argue that the wiretap monitors' admission that they intentionally destroyed notes that were relevant to their voice identifications during the wiretap is evidence of bad faith destruction of potentially exculpatory evidence.

## **Legal Standards**

In United States v. Cooper, 983 F.2d 928 (9th Cir. 1993), the Ninth Circuit summarized the law governing allegations of destruction of evidence in a criminal case:

> Two Supreme Court cases set out the test we apply to determine when the government's failure to preserve evidence rises to the level of a due process violation. In California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984), the court held that the government violates the defendant's right to due process if the unavailable evidence possessed 'exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the

---

[3]The defense has stipulated that the voices on the jail calls are, in fact, Heriberto Montenegro-Mendez and Hector Ricardo Villaruel-Lopez.

PAGE 6 - OPINION AND ORDER

defendant would be unable to obtain comparable evidence by other reasonably
available means.' In <u>Arizona v. Youngblood</u>, 488 U.S. 51, 58, 109 S.Ct. 333, 337,
102 L.Ed.2d 281 (1988), the Court added the additional requirement that the
defendant demonstrate that the police acted in bad faith in failing to preserve the
potentially useful evidence. <u>See</u> <u>also</u> <u>Paradis</u>, 954 F.2d at 1488 (explaining
<u>Trombetta</u> and <u>Youngblood</u> test).

<u>Youngblood</u>'s bad faith requirement dovetails with the first part of the <u>Trombetta</u>
test: that the exculpatory value of the evidence be apparent before its destruction.
<u>Trombetta</u>, 467 U.S. at 489, 104 S. Ct. at 2534. The presence or absence of bad
faith turns on the government's knowledge of the apparent exculpatory value of
the evidence at the time it was lost or destroyed.

<u>Id</u>. at 931. Accordingly, to prevail on a motion to suppress for bad faith destruction of evidence,

a defendant must prove: (1) potentially exculpatory evidence was destroyed; (2) the exculpatory

value of the evidence was apparent before the evidence was destroyed (<i>i.e.</i>, the government

agents acted in bad faith in failing to preserve the evidence); and (3) comparable evidence is not

reasonably available by other means.[4]

"[U]nless a criminal defendant can show bad faith . . . failure to preserve potentially

useful evidence does not constitute a denial of due process of law." <u>Youngblood</u>, 488 U.S. at 58.

"Bad faith is shown when 'the police themselves by their conduct indicate that the evidence could

form a basis for exonerating the defendant.'" <u>United States v. Heffington</u>, 952 F.2d 275, 280 (9th

---

[4]Contrary to the government's argument, the case law does not require defendants to show
that "police" or law enforcement officers actually destroyed the evidence.  In <u>Cooper</u>, for
example, DEA seized several 55-gallon drums that were used to manufacture methamphetamine.
Because the material in the drums was hazardous, DEA contracted with a waste disposal
company to remove and store the drums.  Subsequently, the waste disposal company destroyed
the drums pursuant to company policy—not DEA direction.  Although the DEA agents did not
destroy the evidence, the Ninth Circuit found that the government violated defendant's due
process rights by allowing the independent contractor to destroy potentially exculpatory
evidence.  Defendants need not demonstrate that the police, or DEA agents themselves, destroyed
the evidence.

PAGE 7 - OPINION AND ORDER

Cir. 1991) (quoting Youngblood, 488 U.S. at 58). "Bad faith in this context requires some

showing of 'connivance.'" United States v. Vera, 231 F. Supp. 2d 997, 1000 (D. Or. 2001)

(quoting United States v. Loud Hawk, 628 F.2d 1139, 1146 (9th Cir. 1979), overruled on other

grounds by United States v. Grace, ___ F.3d ___, 2008 WL 2052204, at *4 (9th Cir. May 15,

2008); see also Trombetta, 467 U.S. 488 (finding no violation of defendant's due process rights

based, in part, on the lack of evidence of "a calculated effort to circumvent the disclosure

requirements established by Brady," or "official animus towards respondents or of a conscious

effort to suppress exculpatory evidence.").

## Discussion

Here, defendants have failed to establish that the government destroyed potentially

exculpatory evidence in bad faith.  As an initial matter, the exculpatory value of the destroyed

notes is unknown and defendants' argument as to their relevance is speculative.  The monitors

testified that they kept personal notes on scrap paper and "post-it notes" to help identify voices on

the recorded wiretaps, or to remind themselves "to refer back to a certain call or maybe a key

word or just notes . . . to finish [a] report." (Hermosillo, at 63-63).  Sometimes the monitors

would share the notes as part of their "internal way of communicating," (Hermosillo, at 65), or to

ensure that they were each "aware of whatever is happening or going on at the time." (Mora, at

89).  Mora testified that on "live calls," he would make notes of location references, or time

references in order to quickly relay that information to officers in the field. Id. at 90.  Mora

explained that all of those notes would be incorporated into his daily Line Sheets.  Though

Hermosillo acknowledged that there might be some information in his notes that was not

included in his final Line Sheets or the transcripts, the mere possibility that these personal,

fragmentary notes <u>could</u> be helpful to the defense if the monitors had preserved them is not enough to satisfy the constitutional materiality standard set out in <u>Trombetta</u>. <u>Youngblood</u>, 488 U.S. at 56 n.*.

In light of the government's representations regarding the monitors' testimony at trial, the potential exculpatory value of the monitors' personal notes is marginal, at best. The government has indicated that the monitors' analysis of defendants' jail calls will be the "core" of their testimony at trial. The government will not be offering the monitors' wire room voice identifications, or the Line Sheets themselves as evidence at trial. Instead, the government will offer additional and independent evidence of voice identification, such as corroboration by DEA surveillance, cellular phone subscriber information, self-identification by the speakers on the various phone calls, as well as the monitors' analysis of the known jail calls. As such, the fragmentary notes taken by the monitors during the wiretap would be of little, if any, value in impeaching the monitors' direct testimony. Defendants have failed to demonstrate that the notes taken by the monitors during the wiretap would be exculpatory, or relevant to rebutting or impeaching the evidence and testimony that the government actually plans to introduce in support of its voice identifications.

Even if defendants could show that the notes were potentially exculpatory, they have failed to demonstrate that the exculpatory value of the evidence was apparent to the monitors <u>before</u> they destroyed the notes in 2005. <u>Trombetta</u>, 467 U.S. at 489. In other words, defendants have failed to demonstrate that the monitors (or DEA) destroyed the notes in bad faith. There is no evidence that the monitors thought about the exculpatory value of the notes before shredding the notes. To the contrary, the monitors testified that they routinely destroyed these kinds of

PAGE 9 - OPINION AND ORDER

notes in every case on which they had worked.  The monitors' standard practice of destroying

personal, fragmentary notes after incorporating those notes into daily Line Sheets "should be

regarded as an indication that the disposal of evidence was not performed in 'bad faith.'"

Heffington, 952 F.2d at 281; Trombetta, 467 U.S. at 487.  Moreover, there is no evidence of

"official animus towards [defendants] or of a conscious effort to suppress exculpatory evidence."

Trombetta, 467 U.S. at 488.  Nor is there any evidence of  "a calculated effort to circumvent the

disclosure requirements established by Brady." Id.  That the monitors acknowledge the notes

were helpful in preparing their final Line Sheets does not demonstrate that the notes were

exculpatory, or that the monitors acted in bad faith.  Cf. Killian v. United States, 368 U.S. 231

(1961), cited with approval in Trombetta, 467 U.S. at 487 (holding that the FBI's "normal

practice" of destroying preliminary interview notes, which  "were made for the purpose of"

drafting a final investigatory report, did not violate petitioner's rights).  On this record,

defendants have not met their burden of showing bad faith destruction of potentially exculpatory

evidence.

Finally, the court concludes that defendants are able to obtain comparable evidence by

other reasonably available means.  Trombetta, 467 U.S. at 489.  The content of the destroyed

notes "can be recreated, at least substantially, through examination of [the monitors]" at trial.

Olszewski v. Spencer, 369 F. Supp. 2d 113, 128-29 (D. Mass. 2005).  Indeed, defendants

acknowledge that "[c]ross-examination will elicit that notes existed and that identifications were

subject to change." Def.'s Mem. in Supp., at 9.  Defendants have the Line Sheets, the recorded

wiretaps themselves, and numerous other documents related to the identification of voices on the

tapes.  At least some of those documents contain evidence of the monitors' mistaken

identifications and changed conclusions. This is exactly the kind of impeachment evidence that

defendants maintain the notes would have contained. Again, in light of the government's

representations regarding the scope of the monitors' testimony at trial, the precise number of

"cross-outs" or "mis-identifications" contained in the monitors' personal notes will be only

marginally relevant to the monitors' direct testimony. Defendants possess comparable means of

challenging the reliability of the government's voice identifications.

### Conclusion

For the reasons set out above, the court finds that defendants have failed to establish that

the government destroyed potentially exculpatory evidence in bad faith. Accordingly, the Motion

*In Limine* to Suppress Testimony by Reason of Bad Faith Destruction of Monitoring Notes

(doc. 721) is DENIED.

IT IS SO ORDERED.
DATED this 2 day of June, 2008.

Garr M. King
United States District Judge